## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| CORINTH PIPEWORKS PIPE INDUSTRY S.A. AND CPW AMERICA CO., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION TRADE COMMITTEE, | ) ) ) |
| Defendant-Intervenor. | ) ) |

Court No. 22-00063
NON-CONFIDENTIAL VERSION
Business Proprietary Information
Removed on Pages 23-24

## DEFENDANT'S RESPONSE TO PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

OF COUNSEL:

PATRICIA M. MCCARTHY
Director

CHRISTOPHER KIMURA
Attorney
Office of the Chief Counsel
  For Trade Enforcement & Compliance
U.S. Department of Commerce

L. MISHA PREHEIM
Assistant Director

ERIC J. SINGLEY
Trial Attorney
Commercial Litigation Branch
Civil Division
United States of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Eric.J.Singley@usdoj.gov

January 6, 2023

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ............................................................................ ii

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE
AGENCY RECORD ........................................................................................ 1

STATEMENT PURSUANT TO RULE 56.2 ..................................................... 2

    I.    Administrative Determination Under Review ...................................... 2

    II.    Statement Of The Issues ..................................................................... 2

ARGUMENT .................................................................................................... 2

    I.    Standard Of Review ........................................................................... 2

    II.    Commerce Properly Applied Facts Available When Corinth Failed To Reconcile
        Its Reported Cost .............................................................................. 3

        A.    Legal Framework For Application Of Facts Available With An Adverse
                Inference .................................................................................. 4

        B.    Commerce's Decision To Apply Total Adverse Facts Available To
                Corinth Is Supported By Substantial Evidence And Otherwise In
                Accordance With Law ................................................................ 5

        C.    Commerce's Total Adverse Facts Available Rate Was No Excessive,
                Punitive Or Unjustified ........................................................... 14

        D.    Commerce's Application Of Adverse Facts Available Without Notice And
                An Opportunity For Corinth To Comment Is Supported By Substantial
                Evidence And Is Otherwise In Accordance With Law ............................ 17

    III.    Commerce's Determination That Corinth's Reported Cost Data Is Unavailable Is
        Supported By Substantial Evidence And Is Otherwise In Accordance With
        Law .................................................................................................. 21

    IV.    Commerce's Determination That Corinth's 2019 Cost Data Was Overstated
        And Distorted Is Supported By Substantial Evidence And Is In Accordance
        With Law .......................................................................................... 26

CONCLUSION .............................................................................................. 27

# TABLE OF AUTHORITIES

## CASES

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................3

*BMW of N. AM. v. United States*,
    926 F.3d 1291 (Fed. Cir. 2019)...........................................................................15

*CC Metals & Alloys, LLC v. United States*,
    145 F. Supp. 3d 1299 (Ct. Int'l Trade 2016)........................................................19

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)...............................................................................................3

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)................................................................................................3

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) .........................................................................3, 22

*Gallant Ocean (Thail.) Co., v. United States*,
    602 F.3d 1319 (Fed. Cir. 2010) ...........................................................................16

*Gov't of Argentina v. United States*,
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021)........................................................17

*Home Prods. Int'l. Inc. v. United States*,
    556 F. Supp. 2d 1338 (Ct. Int'l Trade 2008)........................................................19

*Home Prods. Int'l, Inc. v. United States*,
    662 F. Supp. 2d 1360 (Ct. Int'l Trade 2009)........................................................19

*Hyundai Elec. & Energy Sys. Co. v. United* States,
    15 F.4th 1078 (Fed. Cir. 2021) ...................................................... 6, 7, 16, 25, 27

*Hyundai Steel Co. v. United States*,
    319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018)..............................................18

*Hyundai Elec. & Energy Sys. Co. v. United* States,
    466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020) ..................................... 6, 7, 11, 12, 13

*Hyundai Elec. & Energy Sys. v. United States*,
    No. 2021-2312, 2022 U.S. App. LEXIS 22235 (Fed. Cir. 2022) ...........................11

*JBF RAK LLC v. United States*,
   991 F. Supp. 2d 1343 (Ct. Int'l Trade 2014) ...........................................................20

*Jiaxing Bro. Fastener Co. v. United States*,
   822 F.3d 1289 (Fed. Cir. 2016) ...........................................................................18

*Koyo Seiko Co., Ltd. v. United* States,
   516 F. Supp. 3d  (Ct' Int'l Trade 2007) ...............................................................19

*Maverick Tube Corp. v. United States*,
   875 F.3d 1353 (Fed. Cir. 2017) ...........................................................................16

*Myland Indus., Ltd. v. United States*,
   31 C.I.T. 1696 (Ct. Int'l Trade 2007) ..........................................................5, 6, 21

*Nan Ya Plastics Corp. Ltd. v. United States*,
   810 F.3d 1333 (Fed. Cir. 2016) ......................................................................5, 20

*Nan Ya Plastics Corp. Ltd. v. United States*,
   906 F. Supp. 2d 1348 (Int'l Trade 2013) ...........................................................20

*Nippon Steel Corp.*,
   337 F.3d 1373 (Fed. Cir. 2003) ...................................................................4, 5, 12

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) .............................................................................3

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995) .............................................................................17

*Papierfabrik August Koehler SE v. United States*,
   843 F.3d 1373 (Fed. Cir. 2016) .............................................................................4

*Peer Bearing Co. v. United States*,
   587 F. Supp 2d 1319 (Ct. Int'l Trade 2008) .......................................................25

*Pro-Team Coil Nail Enter. v. United States*,
   419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ...................................................8, 24

*Pro-team Coil Nail Enterprise, Inc. v. United States,*
   483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) .....................................6, 7, 8, 24, 25

 *PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012) .............................................................................22

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011) ...........................................................................24

iii

*Shandong Huarong Mach. Co. v. United States*,
   No. 03-00676, 2005 Ct. Int'l Trade LEXIS 57 (Ct. Int'l Trade 2005)......................................25

*Shikoku Chems. Corp. v. United States*,
   795 F. Supp. 417 (Ct. Int'l Trade 1992)..................................................................................19

*Sidenor Indus. SL v. United States*,
   664 F. Supp. 2d 1349 (Ct. Int'l Trade 2009).............................................................................6

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
   298 F.3d 1330 (Fed. Cir. 2002)...............................................................................................15

*Tehnoimportexport v. United States*,
   766 F. Supp. 1169 (Ct. Int'l Trade 1991)................................................................................18

*Thai Pineapple Public Co., Ltd. v. United States*,
   187 F.3d 1362 (Fed. Cir. 1999)...............................................................................................22

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009).................................................................................................................2

## UNITED STATE CODE

19 U.S.C. § 1516a(b)(1)(B) ..............................................................................................................2

19 U.S.C. § 1673b(b) .....................................................................................................................17

19 U.S.C. § 1673d(a) ......................................................................................................................17

19 U.S.C. § 1677b(f)(1)(A) .......................................................................................................5, 21

19 U.S.C. § 1677e ............................................................................................................................4

19 U.S.C. § 1677e(a) ........................................................................................................................4

19 U.S.C. § 1677e(b)....................................................................................................................4, 5

19 U.S.C. § 1677e(b)(2) ............................................................................................................14, 17

19 U.S.C. § 1677e(c)(1) .................................................................................................................14

19 U.S.C. § 1677m(d) .................................................................................................................4, 16

19 U.S.C. § 1677m(e) .......................................................................................................................4

19 U..S.C. § 1677m(g) ...................................................................................................17, 18

19 U.S.C. § 1677m(i)(3) ......................................................................................................4

## REGULATIONS

19 C.F.R. § 351.308(c)(1)(i)-(iii) ........................................................................................5

19 C.F.R. § 351.408(c)(1) (2005) ......................................................................................19

## RULES

Rule 56.2 .............................................................................................................................. 2

## FEDERAL REGISTER NOTICES

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Prestressed Concrete Steel Wire Strand from Mexico*,
     68 Fed. Reg. 68350 (2008) ...........................................................................................5

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Lined Paper Products from India*,
     71 Fed. Reg. 45012 (2006) ........................................................................................... 6

*Large Diameter Welded Pipe from Greece*,
     87 Fed. Reg. 7120 (Dep't of Commerce Feb. 8, 2022) ................................................2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

_____
|                                      )
CORINTH PIPEWORKS PIPE INDUSTRY S.A.   )
AND CPW AMERICA CO.,                   )
                                       )
                    Plaintiffs,        )
                                       )
          v.                           )          Court No. 22-00063
                                       )          NON-CONFIDENTIAL VERSION
UNITED STATES,                         )          Business Proprietary Information
                                       )          Removed on Pages 23-24
                    Defendant,         )
                                       )
          and                          )
                                       )
THE AMERICAN LINE PIPE PRODUCERS       )
ASSOCIATION TRADE COMMITTEE,           )
                                       )
                    Defendant-Intervenor. )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the motion for

judgment on the administrative record filed by plaintiffs Corinth Pipeworks Pipe Industry S.A.

and CPW America Co., (collectively Corinth) challenging the Department of Commerce's

(Commerce) final results in the 2019-2020 antidumping review covering large diameter welded

pipe from Greece.  As we explain below, the Court should deny the motion because the final

results are supported by substantial evidence and are otherwise in accordance with law.

STATEMENT PURSUANT TO RULE 56.2

I.   Administrative Determination Under Review

The administrative determination under review is the final results of the 2019-2020 administrative review of the antidumping duty order covering large diameter welded pipe from Greece.  *See Large Diameter Welded Pipe from Greece*, 87 Fed. Reg. 7120 (Dep't of Commerce Feb. 8, 2022) (final results of admin. review) (P.R. 100) (Final Results),[1] and accompanying issues and decision memorandum (P.R. 96) (IDM).  The period of review is April 19, 2019, through April 30, 2020.

II.   Statement Of The Issues

1.      Whether Commerce's application of facts available with an adverse inference to Corinth is supported by substantial evidence and is otherwise in accordance with law.

2.      Whether Commerce's decision that Corinth's cost data was unavailable is supported by substantial evidence and is otherwise in accordance with law.

3.      Whether Commerce's determination that Corinth's 2019 costs were overstated and distorted is supported by substantial evidence and is otherwise in accordance with law.

ARGUMENT

I.   Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

---

[1] Citations to public and confidential documents from the administrative record are identified as "P.R.__" and "C.R.__," respectively.

"Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

The possibility of drawing two inconsistent conclusions from the evidence in the record does not preclude Commerce's determination from being supported by substantial evidence. *Consolo*, 383 U.S. at 620. Moreover, Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

II.    Commerce Properly Applied Facts Available When Corinth Failed to Reconcile Its Reported Costs

Commerce's decision to apply adverse facts available to Corinth for failure to provide a complete cost reconciliation in the form and manner requested is supported by substantial evidence and otherwise in accordance with law. Further, Commerce provided Corinth with an opportunity to correct its reconciliation deficiencies and nothing further was required.

A.     Legal Framework For Application Of Facts Available With An Adverse Inference

If Commerce determines that a response does not comply with the request for information in an antidumping duty review, it shall "promptly inform the person submitting the response of the nature of the deficiency{.}"  19 U.S.C. § 1677m(d).  If that party submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, Commerce may, subject to 19 U.S.C. § 1677m(e), disregard all or part of the original and subsequent responses, as appropriate.

Pursuant to 19 § U.S.C 1677e, Commerce follows a two-step process to determine whether to use an adverse inference when selecting among the facts otherwise available.  Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary information is not available, or (2) an interested party (a) withholds information requested by Commerce, (b) fails to provide the information in the form or in the manner requested, (c) significantly impedes the proceedings, or (d) provides information that cannot be verified.  19 U.S.C. § 1677e(a); 19 U.S.C. § 1677m(i)(3).

If Commerce concludes that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference when selecting from facts otherwise available.  19 U.S.C. § 1677e(b).  A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The standard "does not condone inattentiveness, carelessness, or inadequate record keeping."  *Id.* at 1382.  The standard also requires respondents to "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question."  *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (citing *Nippon Steel Corp.*, 337 F.3d at 1382).  Commerce may apply an adverse

4

inference for a respondent's "failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Nippon Steel Corp.*, 337 F.3d at 1383.  Pursuant to this standard, it is irrelevant whether the respondent was intentionally evasive or whether the respondent thought it had a valid legal basis for withholding the requested information.  *See Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text.").  When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record.  *See* 19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c)(1)(i)-(iii).

    B.    Commerce's Decision To Apply Total Adverse Facts Available to Corinth Is
                Supported By Substantial Evidence and Otherwise In Accordance With Law

Corinth contends that Commerce's decision to apply total adverse facts available is unwarranted because Corinth did not withhold necessary information or significantly impede the investigation, and that it acted to the best of its ability.  Corinth Br. at 16-19, 37-40.

Under § 19 U.S.C. 1677b(f)(1)(A), Commerce shall normally calculate costs based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise.  "The cost reconciliation 'assures {Commerce} that the respondent has accounted for all costs before allocating those costs to individual products' and thus serves as the starting point for verifying the accuracy of a respondent's reported costs." *Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696, 1703 (Ct. Int'l Trade 2007), (citing *Notice of Final Determination of Sales at Less Than Fair Value and*

*Negative Final Determination of Critical Circumstances: Prestressed Concrete Steel Wire Strand from Mexico*, 68 Fed. Reg. 68350 (2008) (Wire Strand from Mexico)) and accompanying IDM at Comment 6 and *Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 Fed. Reg. 45012 (2006) (Paper from India) and accompanying IDM at Comment 14. "Because of its importance, Commerce has applied total adverse facts available when a proper cost reconciliation is not provided." *Myland Indus., Ltd.*, 31 C.I.T. at 1703, (citing Wire Strand from Mexico and Paper from India).  In both *Hyundai Electric & Energy Systems Co., LTD. v. United States* and *Pro-Team Coil Nail Enterprise, Inc. v. United States*, cases with similar facts, this Court and the Court of Appeals for the Federal Circuit sustained Commerce's use of total adverse facts available when respondents failed to follow Commerce's reconciliation instructions.  466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020) (*aff'd Hyundai Elec. & Energy Sys. Co. v. United* States, 15 F.4th 1078 (Fed. Cir. 2021)) (herein *Hyundai Electric*), *and* 483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) (herein *Pro-Team II*), *see also Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (Ct. Int'l Trade 2009).

Corinth failed to submit the reconciliation information to Commerce in the form and manner requested, thus significantly impeding the proceeding and thus warranting an application of facts available.  Corinth also failed to act to the best of its ability by not submitting a complete cost reconciliation and not providing full and complete answers to Commerce's inquiries, thus warranting an application of an adverse inference.  Commerce requested Corinth to submit complete reconciliation information in the initial section D questionnaire and two supplemental questionnaires.  *See* Initial Questionnaire (P.R. 11), Section D Supplemental Questionnaire (P.R. 55), and Second Section D Supplemental Questionnaire (P.R. 63).  Proper reconciliation data is a

significant part of Commerce's cost calculations because it demonstrates that expenses for the period of review were properly included and excluded from the record, and it makes transparent the various reconciling items' cost types and valuations.  IDM at 10.  Despite multiple opportunities to do so, Corinth repeatedly failed to follow Commerce's instructions and continued to provide incomplete and unreliable reconciliation data.

*Hyundai Electric* and *Pro-Team II* are applicable to this case.  In *Hyundai Electric*, this Court and the Court of Appeals for the Federal Circuit upheld Commerce's finding that respondent Hyundai had failed reconciliation and subsequent application of total adverse facts available.  Similar to this case, Hyundai provided worksheets and cost-reconciliation information "not formatted in accordance with the worksheet Commerce provided."  466 F. Supp. 3d at 1315-1316.  Commerce issued supplementary questionnaires with specific instructions, yet Hyundai provided another inadequate response.  *Id.* at 1316.  For its final results, "Commerce determined that Hyundai did not provide requested cost reconciliation data despite being required {to do so} two different times."  *Id.* (internal quotations and citation omitted).  The total facts available determination was upheld, because "Commerce is not obligated to consider information that is so incomplete that it cannot serve as a reliable basis for reaching the applicable determination."  *Id.* at 1318 (internal quotation and citation omitted).  The Court of Appeals sustained Commerce's application of an adverse inference because it also found that Hyundai, on two occasions, including when it submitted two questionnaire responses with the same deficiency, did not act to the best of its ability.  *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021).

Similarly, in *Pro-Team II*, this Court sustained Commerce's application of total adverse facts available, after an initial remand for further explanation, to respondent Unicatch after it

failed to submit a complete cost reconciliation in the form and manner requested despite multiple opportunities to do so.  483 F.Supp.3d at 1246.  Specifically, Commerce had requested three times that Unicatch "revise its cost reconciliation to reconcile the sales from {its} audited financial statements to the extended total cost of manufacturing in {its} submitted cost database."  *Id*. (internal quotations and citation removed).  However, Unicatch continued to submit reconciliations that "failed to directly link to the antidumping cost database."  *Id*. at 1247.  Moreover, Commerce "confronted significant discrepancies when it attempted to complete the reconciliation."  *Id*.  Unicatch, like Corinth, also attempted to "explain how Commerce could use record information to complete the reconciliation."  *Id.*  Commerce rejected Unicatch's explanations because such "alternative adjustment{s} {} only leads to more questions regarding the completeness of the reconciliation, the reconciling items, and whether all costs were properly included or excluded," and this Court sustained Commerce's choice to do so.  *Pro-Team Coil Nail Enter. v. United States*, 419, F.Supp. 3d 1319, 1336 (Ct. Int'l Trade 2019) (internal quotations and citation omitted) (herein *Pro-Team I*).

The facts of this case mirror that of *Hyundai Electric* and *Pro-Team II.*  In the initial section D questionnaire, Commerce instructed Corinth to (1) provide a worksheet reconciling the financial accounting system fiscal year cost of sales (or equivalent) to the period of review cost of sales (or equivalent); (2) provide a worksheet reconciling the period of review cost of sales (or equivalent) to the total period of review costs from the cost accounting system (*i.e.*, the source used to derive the reported costs) and include a description of and quantify each reconciling item; and (3) provide a worksheet reconciling the total period of review costs from the cost accounting system, *i.e.*, the source used to derive the reported costs, to the total period of review costs of manufacture reported.  *See* IDM at 12 (citing Corinth's Section D Questionnaire

Response (P.R. 34) (C.R. 35)).  Commerce also provided Corinth a guiding template as an example of the requested format.  *See* IDM at 12 (citing Section D Supplemental Questionnaire (P.R. 55) (C.R. 84)).

In its initial section D questionnaire response, Corinth failed to follow Commerce's instructions to submit a complete reconciliation and instead submitted two separate reconciliation sets representing two separate parts of the period of review, 2019 and 2020.  The 2019 set includes the first three months of the year that fall outside the period of review.  *See* IDM at 12 (citing Corinth's Section D Questionnaire Response (P.R. 34) (C.R. 35)).  To reconcile its extended cost database with the double counted costs in its SAP reporting system, Corinth also included production costs at the semifinished production stage and costs of raw materials *in addition to* production costs for finished products.  This distorted Corinth's data and complicated Commerce's analysis.  *Id.*  Commerce notified Corinth of its submission's deficiencies in its first supplemental section D questionnaire, accompanied by the same template issued in the initial questionnaire with specific instructions to reconcile 2019's cost of goods sold to the period of review cost of manufacture, *i.e.*, removing the cost of manufacture for first three months of 2019 and adding the cost of manufacture for the first four months of 2020, and explaining Corinth's reconciliation line items.  *Id.*

In response to the first supplemental section D questionnaire, Corinth again failed to exclude its costs from the first three months of 2019.  *Id.* at 12-13.  Corinth also failed to show the actual cost of merchandise not under consideration, *i.e.*, non-scope merchandise, or the actual cost of merchandise under consideration sold to third countries.  *Id.*  Without this information, Commerce cannot reconcile how a respondent's reportable and non-reportable costs were allocated.  Corinth also submitted "voluminous" numbers of worksheets without accompanying

explanations, frustrating Commerce's attempts to understand Corinth's reporting and accounting methodology. *Id.* at 13 (citing Second Section D Supplemental Questionnaire at 4).

In the second supplemental section D questionnaire, Commerce informed Corinth that its "extensive calculations worksheets and reconciliation are difficult to interpret because of the lack of adequate descriptions as to the methodology used in the normal records or in your reporting to Commerce." *Id.* Commerce instructed Corinth to explain "why it was necessary to include the cost for the first {three} months of 2019 in your reported costs and to reconcile your reported costs to Corinth's books and records." Second Section D Supplemental Questionnaire at 4. In its second supplemental response, Corinth responded that its "SAP system can generate costing reports for a particular month or for a range of months in the same year…{B}ut is not able to generate a cost report for a period that spans two years" and it "is not able to create a '{period of review} cost report' by combining the results…for April-December 2019 and another report for January-April 2020." *Id.* at 13 (citing Corinth's Supplemental Section D Questionnaire Response (P.R. 62) (C.R. 118) at Exhibit (Supp D)-9 (C.R. 119)).

Corinth's responses and acknowledgements in its administrative and court case briefs show that Corinth understood the submitted reconciliation was not adequate. First, Corinth acknowledged in its second supplemental section D response that its SAP system had a viable way to remove the first three months of costs in 2019 falling outside of the period of review, exactly as it had done for the 2020 reconciliation. Although it could not submit a single report spanning the full period of review, Corinth could have reconciled its period of review costs by removing the three months from 2019 and reconciling the remaining cost of manufacture to its trial balance for the last nine months of 2019 and to its SAP cost report. *Id.* Corinth chose not to separate the first three months of 2019 not because it was unable to do so, but because it alleges

that it did not produce merchandise under consideration during that time.  Corinth Br. at 18.

There are no criteria that permit respondents to include out-of-review months of the year simply

because there was no production of subject merchandise.  Regardless, on three questionnaire

occasions, Corinth submitted the entirety of the 2019 fiscal year.  Corinth argues that, because it

did not produce merchandise under consideration during this time, its 2019 costs were not

overstated and distortive, and that Commerce should have gap-filled any otherwise missing

information.  Corinth Br. at 29.  However, this misses the point of the reconciliation:  if there are

gaps in the reconciliation submissions, Commerce cannot reconcile a respondent's cost database.

"Again, as is the case here, Commerce is not obligated to consider information that is so

incomplete that it cannot serve as a reliable basis for reaching the applicable determination."

*Hyundai Elec. & Energy*, 466 F. Supp. 3d at 1317-1318.  None of Corinth's cited case law holds

otherwise; rather, those cases deal with entirely distinguishable issues, *i.e.*, a misunderstanding

of merchandise scope, where only one sale was affected causing a small gap, and gap filling was

the appropriate remedy.  *Hyundai Elec. & Energy Sys. v. United States*, No. 2021-2312, 2022

U.S. App. LEXIS 22235 (Fed. Cir. 2022).

Second, Corinth also acknowledges that it "provided an alternate to Commerce's

preferred reconciliation structure" when it added the cost of consumption to the total costs

reported in the financial accounting to match the double counted costs in its SAP system.  *Id*.

Corinth's alternative adjustments only raised "more questions" about its reconciliation.  *See Pro-Team I* at 1336.  By not submitting a complete reconciliation or following the reconciliation

template, Corinth withheld needed information and significantly impeded the proceedings.

Further, an extensive and exhaustive analysis of Corinth's available reconciliation documents

showed that the double counted items were imbedded in Corinth's cost of production (or

COP)/cost value (or CV) files, not identifiable, and not compliant with the generally accepted accounting principles, among numerous other discrepancies.  *See* Final Calculation (P.R. 97) (C.R. 144).

The result was that Corinth added the cost of consumption to the cost of manufacture, *i.e.*, the double counted costs, and identified only the costs of non-subject merchandise and the associated double counted costs *without* identifying the specific three reconciling values for cost of manufacture of merchandise under consideration, merchandise not under consideration, merchandise sold to third countries, and the separate cost of consumption.  Corinth's alternative did not break out these components as requested and did not identify the costs of non-subject merchandise or merchandise sold in third countries.

Corinth argues at two different points in its brief that total adverse facts available was not warranted.  It argues first that Commerce failed to examine Corinth's actions and the extent of its abilities, efforts, and cooperation in responding to requests for information.  Corinth Br. at 18. Corinth later argues that it believed it was simply following the same approach in the investigation, and that it did all that it could when timely responding to Commerce's requests. Corinth Br. at 38.  Corinth's arguments are unavailing.  First, the *Hyundai* Courts held that Hyundai's failure to reconcile "applies to Hyundai's reported cost information *as a whole*." *Hyundai Elec. & Energy*, 466 F. Supp. 3d at 1318 (emphasis in original), *aff'd*, 15 F.4th 1078 (Fed. Cir. 2021).  Because Corinth's failure to reconcile undermines the entirety of its cost database, total adverse facts available is warranted on this basis alone.

Second, Commerce may apply total adverse facts available "regardless of motivation or intent."  *Nippon Steel Corp.*, 337 F.3d at 1383.  Corinth says the logic of *Pro-Team I* is instructive, where this Court remanded a total adverse facts available determination to

Commerce for reconsideration.  However, in *Pro-Team II*, this Court subsequently sustained Commerce's use of adverse facts available after Commerce provided a reasoned explanation. *See Pro-Team II*.  Here Commerce provided a reasoned explanation for applying total adverse facts available and its selected rate complies with the statute.  *See* IDM at 7-8.  Accordingly, *Pro-Team I* provides no basis for remand.

Corinth also argues that, if the Court finds that Commerce improperly imposed an adverse inference yet finds that data is in fact missing, Commerce should apply neutral facts available as there was other information on the record usable to calculate a dumping margin or to confirm the reliability of the information.  Corinth Br. at 42.  In the alternative, Corinth also argues that, if the Court sustains Commerce's application of adverse facts available, Commerce should be required to only apply *partial* adverse facts available by using the highest cost reported for any control number (CONNUM) to all CONNUMS.  *Id*. at 44.  Corinth's arguments are illogical as the conditionality for each argument depends on the Court upholding Commerce's determination that it could not reconcile.  As explained, a failed reconciliation applies to the cost information "*as a whole*."  *Hyundai Elec. & Energy*, 466 F. Supp. 3d at 1318.  Gaps in the reconciliation data means the data is unreconcilable, and because the application of adverse facts available derives from the failure to reconcile, upholding the former means upholding the latter.

Lastly, Corinth argues that Commerce did not consider how Corinth would have benefitted from failing to supply the required information.  Corinth Br. at 39-40.  However, Corinth does not point to any case law supporting its assertion that this fact is determinative in Commerce's application of total facts available with an adverse inference, nor to any case law showing that over reported costs mean a respondent could not have benefitted in other ways. Further, Corinth acknowledges that it is only "{o}ne of the factors Commerce considers in

deciding to apply {adverse facts available}." *Id*. at 39.  Corinth's argument does not present grounds for remand.

Ultimately, Corinth failed to provide complete reconciliation data in the form or manner requested by Commerce despite multiple opportunities to do so, and, thereby, it withheld information, significantly impeded the proceeding, and did not act to the best of its ability. Accordingly, Commerce's application of total adverse facts available is supported by substantial evidence and otherwise in accordance with law.

C.     Commerce's Total Adverse Facts Available Rate Was Not Excessive, Punitive or Unjustified

Corinth argues that the adverse facts available rate selected by Commerce was unreasonable.  Corinth Br. at 40.  The statute expresses no preference regarding the rate to be used as "potential sources of information" when applying an adverse inference.  19 U.S.C. § 1677e(b)(2).  The four potential sources of information for applying an adverse inference include (A) the petition, (B) the final determination in the investigation, (C) any previous administrative review, or (D) any other information placed on the record.  *Id*.   Pursuant to 19 U.S.C. § 1677e(c)(1), if Commerce "relies on secondary information obtained in the course of the investigation rather than on information obtained in the course of an investigation or review, {Commerce}…shall…corroborate that information from independent sources that are reasonably at their disposal."  The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act clarifies "corroborate" to mean that Commerce will satisfy itself that the secondary information to be used has probative value.  IDM at 7 (citing the Statement of Administrative Action, H.R. Doc. 103- 316, vol. 1, at 870 (1994)).  Commerce need not demonstrate that the dumping margin reflects an alleged "commercial reality" of the interested party.  *Id*.  Commerce has wide discretion to assign the highest calculated rate to uncooperative

14

parties.  *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002).

Commerce adhered to the statute and its practice and selected the highest dumping margin alleged in the petition, 41.01 percent.  *Id*. at 7-8.  Commerce corroborated the petition margin by examining the transaction-specific margins calculated for Corinth during the most recently completed segment of this proceeding, the less-than-fair-value investigation.  *Id*. at 8.  Commerce found the petition rate of 41.04 percent to be within the range of transaction specific margins and is reliable, relevant, and has probative value.  *Id*.

Corinth argues that the totality of the circumstances standard under *BMW of N. AM. v. United States*, is instructive.  926 F.3d 1291, 1302 (Fed. Cir. 2019).  Corinth then points to four reasons why Commerce's margin is "drastically overstated, punitive, and unjustified."  Corinth Br. at 41.  However, *BMW* is readily distinguishable from this case, because in that case the Court of Appeals considered the fact that as a result of a court decision overturning a negative investigation determination, BMW was completely unaware it had an administrative review pending, which caused its failure to cooperate with Commerce's requests, and the Court remanded for Commerce to consider those circumstances.  *Id*.  Corinth does not claim to have similar "procedural irregularities" that warrant a remand, and there are no facts for Commerce to reconsider as the record primarily concerns Corinth's incomplete reconciliations, inadequate explanations (which Corinth acknowledges in its brief at page 44), as well as voluminous unresponsive data sheets showing costs being swapped in and out of calculations.  IDM at Comment 1 and Final Calculation Memo.  Rather, *BMW* "is mindful of the great deference given to Commerce in making these {adverse facts available} determinations{,}" and that is the standard the Court should apply.  *Id*. at 1302.

In any event, none of Corinth's four points have any weight on what adverse margin Commerce selects.  To the extent Corinth relies on Commerce's investigation finding, the Federal Circuit has "rejected the notion that Commerce is forever bound by its past practices." *Hyundai Elec. & Energy*, 15 F.4th at 1089.  The same holds here:  although Commerce may have been able to reconcile Corinth's costs at one point, this does not bind the agency with respect to the record before it in this review.  Corinth also cites its timeliness; however, this does not detract from its failure to provide the reconciliation in the form and manner requested.  Corinth was provided multiple opportunities to correct the deficiencies in its reporting.  An "adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response."  *Id.* at 1090, citing *Maverick Tube Corp. v. United States*, 875 F.3d 1353, 1361 (Fed. Cir. 2017) ("Borusan had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified Borusan of that defect.  § 1677m(d) does not require more.").  Corinth also cites Commerce's failure to issue post-preliminary questionnaires yet cites to no authority requiring Commerce to do so or that this should be a factor considered in applying adverse facts available.

Finally, Corinth's reference to *Gallant Ocean Co.* is inapposite.  In *Gallant Ocean Co.*, the respondent Gallant was assigned the adjusted investigation petition rate of 57.64 percent as its adverse facts available rate.  *Gallant Ocean (Thail.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010).  However, cooperating parties in the same review received drastically lower rates than the adjusted petition rate, indicating that better information was available.  *Id.* at 1324. Moreover, Gallant did not participate in the original investigation.  *Id.*  Lastly, *Gallant Ocean* was issued five years before the statute was amended to identify a non-exclusive list of sources

that can be used for selecting a margin based on an adverse inference; here, Commerce is acting pursuant to its statutory authority.  Corinth was a respondent in the investigation and is now the sole mandatory respondent, and, as discussed above, Commerce corroborated the highest dumping margin alleged in the less-than-fair-value petition pursuant to 19 U.S.C. § 1677e(b)(2) and its past practice; there are no facts or other comparable respondent rates to support Corinth's claim that its adverse facts available rate is not reasonably accurate.

Because Commerce has adhered to the statute, and its practice in selecting a total adverse facts available rate, corroborating it, and providing a reasoned explanation, this Court should sustain Commerce's final results.

      D.     Commerce's Application Of Adverse Facts Available Without Notice And An Opportunity For Corinth To Comment Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

Corinth contends that Commerce violated 19 U.S.C. §1677m(g) by failing to provide an opportunity to comment on changes in methodology made in the final results and that Commerce should have issued a post-preliminary decision memorandum.  Corinth Br. at 8-13.

Pursuant to 19 U.S.C. § 1673b(b) and 19 U.S.C. § 1673d(a), Commerce is required to make preliminary determinations and final determinations.  There are no statutory requirements for Commerce to issue any other determination between the preliminary and final determinations, *see* 19 U.S.C. §§ 1673b(b), 1673d(a).  As the Federal Circuit has recognized, "{p}reliminary determinations are 'preliminary' precisely because they are subject to change." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  Additionally, this Court has held that "Commerce may change its stance on issues decided preliminarily in its final determinations, so long as it explains the reasoning for the change and 'its decision is supported by substantial evidence and in accordance with law.'" *Gov't of Argentina v. United States*, 542 F.

Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021) (citing *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) (internal citations omitted)); *see, e.g., Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1300 (Fed. Cir. 2016) ("Commerce provided notice of its preliminary and final determinations—even though Commerce was not required to give prior notice that it had selected Thailand over India."), *and Tehnoimportexport v. United States*, 766 F. Supp. 1169, 1175 (Ct. Int'l Trade 1991) (holding that Commerce had no obligation to notify the parties beforehand that it had chosen a different surrogate country for the final determination than it used in the initial determination)).

Corinth references 19 U.S.C. § 1677m(g) as its notice and comment authority and cites to several cases to support its argument. However, none of the case law cited by Corinth supports its argument that use of adverse facts available constitutes a change in methodology that would require Commerce pursuant to 19 U.S.C. § 1677m(g) to provide notice and an opportunity to comment. And regardless, Commerce did provide Corinth with notice and an opportunity to comment on information that was timely submitted to Commerce during the review consistent with 19 U.S.C. § 1677m(g). At bottom, Corinth alleges that it did not have a chance to comment on Commerce's application of adverse facts available decision made in the final results. But, as the Court has held previously, advance notice of a final decision made by Commerce is not required. Indeed, 1677m(g) makes clear that Commerce must simply provide parties with an opportunity to comment "before making a final determination" – not after the determination is made. And that opportunity is to afford petitioners a chance to comment "on the information obtained by {Commerce} . . . upon which the parties have not previously had an opportunity to comment." *Id.* It is not an opportunity to comment on Commerce's final determination.

In *Koyo Seiko Co., Ltd. v. United* States, 516 F. Supp. 3d 1323 (Ct' Int'l Trade 2007) and *Shikoku Chems. Corp. v. United States*, 795 F. Supp. 417 (Ct. Int'l Trade 1992), the Court analyzed changes in methodology where plaintiffs argued they had detrimentally relied on Commerce's old methods when conducting pricing and cost activities, specifically, changes in the family averaging methodology to the new model match methodology and calculating the home market price packing adjustment.  *Koyo Seiko Co.,* 795 F. Supp. at 1332, *Shikoku Chems. Corp.,* 795 F. Supp. at 420.  Likewise, in *Home Prods. Int'l. Inc. v. United States*, 556 F. Supp. 2d 1338 (Ct. Int'l Trade 2008), Commerce sought a voluntary remand because, as later seen in *Home Prods. Int'l, Inc. v. United States*, 662 F. Supp. 2d 1360 (Ct. Int'l Trade 2009), the results of its changed methodology "'defied commercial reality' and {was} too inconsistent with 19 C.F.R. § 351.408(c)(1) (2005), which provides that normally sales from a market economy are in accordance with market principles."  *Home Prods. Int'l, Inc.*, 662 F. Supp. 2d at 1363.

Similarly, in *CC Metals & Alloys, LLC v. United States*, 145 F. Supp. 3d 1299 (Ct. Int'l Trade 2016), the Court remanded because there was "merit" in plaintiffs' contention that Commerce's calculations were inconsistent with a policy bulletin.  *CC Metals & Alloys, LLC*, 145 F. Supp 3d at 1311.  The distinctions between this case law and Corinth's situation are clear.  First, Corinth is not arguing detrimental reliance on an old methodology spanning multiple administrative reviews.  Second, the methodological examples in the case law above do not consider whether properly applying total adverse facts available, for failure to act to the best of its ability to provide necessary information in the form and manner requested, requires any additional notice other than the deficiency notices provided here, *i.e.*, the multiple supplemental questionnaires requesting reconciliation information in the form and manner identified by Commerce.

The case law cited by Corinth dealing with adverse facts available, *Nan Ya Plastics Corp. v. United States*, also does not support its claim. *Nan Ya Plastics* concerns Commerce's corroboration of the adverse facts available rate as it changed from the preliminary to the final, a distinct issue that has no bearing on whether notice and comment is required when adverse facts available is applied. 906 F. Supp. 2d 1348. First, contrary to the facts in *Nan Ya Plastics*, where Nan Ya was not provided an opportunity to challenge Commerce's determination that the adverse rate was not aberrational, Corinth had the opportunity to, and did argue, in preliminary comments and in a case brief and rebuttal brief, that its data was complete, and against the petitioner's request for the application of total adverse facts available. Second, the plaintiff in *Nan Ya Plastics* challenged Commerce's corroboration of the adverse margin from the preliminary to the final determination after adverse facts had already been applied, as opposed to Corinth's point that an application of adverse facts available itself and the use of secondary sources is a methodology change that requires notice and an opportunity to comment. Lastly, Commerce addressed and rejected Nan Ya's arguments on remand, and this Court and the Court of Appeals sustained that determination, finding that Commerce is not "require{d}…to apply the statutory methods to determine the industrywide 'commercial realities prevailing' during a particular time period." *Nan Ya*, 810 F.3d at 1344.

The remainder of Corinth's references do not support that Commerce is required to issue post-preliminary decisions in situations like this; rather, these show that Commerce is not limited by any statutory or regulatory authority when it decides to do so. *See JBF RAK LLC v. United States*, 991 F. Supp. 2d 1343, 1352-1353 (Ct. Int'l Trade 2014) (supporting Commerce's decision to issue a post-preliminary decision and that its choice to do so was not limited).

Accordingly, Commerce was not required to provide Corinth further notice and opportunity to comment after it applied total adverse facts available for the final results.

IV.    Commerce's Determination That Corinth's Reported Cost Data Is Unavailable Is <u>Supported By Substantial Evidence And Is Otherwise In Accordance With Law</u>

Commerce's inability to use Corinth's reported cost data is supported by substantial evidence and should be sustained.  Specifically, Commerce determined that Corinth's cost reconciliations (1) failed to exclude costs from the first quarter of 2019 that fall outside the period of review, (2) indicated that Corinth's cost database includes amounts associated with categories of costs that should not have been reported in the cost database, particularly semifinished goods that were used in finished goods, and (3) because of these failings and lack of clarity, Commerce and the petitioners were restricted in examining both the true nature of the items necessary for reconciliation and the completeness and reasonableness of Corinth's reported costs.  *See* Final Calculation Memo at 1.

19 U.S.C. § 1677b(f)(1)(A) requires Commerce to calculate the cost of production using the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise.  As mentioned previously, the cost reconciliation "'assures {Commerce} that the respondent accounted for all costs before allocating those costs to individual products' and thus serves as the starting point for verifying the accuracy of a respondent's reported costs."  *Myland Indus., Ltd.*, 31 C.I.T. 1703 (citing Wire Strand from Mexico).

In cases where a party challenges Commerce's determinations with respect to complex methodological, economic, and accounting issues, "tremendous deference" is owed to the expertise of the Secretary of Commerce" because "antidumping . . . determinations involve

complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen., 88 F.3d at 1039* (internal citations omitted); *see also Thai Pineapple Public Co., Ltd. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (explaining that "reviewing courts must accord deference to the agency in its selection and development of proper methodologies"). In fact, "{t}he methodologies relied upon by Commerce in making its determinations are presumptively correct." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Thai Pineapple*, 187 F.3d at 1365).

Commerce undertook an accounting analysis of Corinth's reconciliation submissions to determine whether it could reasonably rely on Corinth's information on the record. First, Commerce started with Corinth's 2019 audited financial statement amount for cost of manufacture and then added the double counting reconciliation line items to reconcile the total costs per the 2019 SAP cost report. Final Calculation Memo at 2. Then, Commerce removed the identifiable overstated costs in an attempt to arrive at the total reportable costs figure. *Id*. This analysis not only demonstrated that the total cost of manufacture did not reconcile with the reported cost of the merchandise in question, but also revealed numerous issues that could have been addressed had Corinth been responsive to Commerce's requests for proper reconciliation. *Id*.

The final calculation memo highlights four major problems with Corinth's reconciliation data. First, "Corinth failed to provide a proper cutoff of accounting periods and a complete period of review cost reconciliation worksheet." *Id*. Commerce's accounting analysis showed that Corinth's reported costs still appear to include merchandise produced outside the period of review, even after combining them. This meant Commerce did not have its reconciliation starting point, the period of review cost of manufacture. Without this starting point, Commerce

cannot reconcile Corinth's reported costs.  Second, the accounting analysis also showed that double counted costs remained in Corinth's cost of production file even after all identifiable reconciliation items have been removed.  *Id.* at 3.  The cost reconciliation does not show how the double counted costs in Corinth's 2019 SAP cost report, data extracted directly from its SAP system, were excluded for its reporting purposes, nor can this be determined from Corinth's section D responses.  *Id.*  Corinth's reconciliation data does not separately show the actual costs of merchandise not under consideration and merchandise under consideration sold in third countries, which should also be reconciling items, and there is no way to determine their actual costs from 2019 SAP costs report.  *Id.* at bullet point 3.  Third, "even when the identifiable additional amounts of double counting are removed, it becomes clear that amounts in the cost of production file includes costs and quantities that are not in accordance with Corinth's generally accepted accounting practices compliant audited financial statements."  *Id.*  The differences discovered in these costs and quantities "can't be reconciled."  *Id.*

Fourth, there were "significant differences in materials and conversion costs between costs reported in the audited financial statements and its SAP system for reportable and non-reportable products and between finished and semifinished products."  *Id.* at 3-4.  The final calculation memo's analysis shows that the Cost Per Financial Accounting 2019 data submitted by Corinth "attributes {zero} raw material costs" to semifinished merchandise under consideration and other semifinished products, "yet semifinished products were reported in the 2019 COP/CV cost file."  *Id.* at 4.  Moreover, it attributes [ ████████ ] raw materials to {merchandise under consideration sold to third countries}."  *Id.*  Various costs across the SAP 2019 reports and the costs per the financial accounting are also significantly different, such as the SAP 2019's cost report of [ ██████ ] Euros to "{merchandise under consideration} not {cost

of production}" versus [████] Euros in the cost per financial accounting and [████]

Euros and [████] Euros, respectively, for semifinished merchandise under consideration.

*Id*.  These points and others included in the final calculation memo "raised concerns about how

the double counted costs were reported across different categories of merchandise."  *Id.*

Corinth's reconciliation submissions did not reconcile its cost information on the record,

rendering Corinth's cost data unusable.

Corinth claims Commerce's determinations are based on faulty and unreasonable

assumptions about its cost data submissions.  Corinth Br. at 19-29.  Corinth also raised its double

counting concerns in a ministerial error allegation.  *See* Corinth Ministerial Error Allegations.

However, this Court has found that, relevant to verifications, it is the respondent's responsibility

to build a clear record:  "While TC/Unicatch asserts that Commerce misunderstood the submitted

data and ignored Unicatch's explanation for the discrepancy…it was Unicatch's responsibility to

build a clear record – not Commerce's."  *Pro-Team I* at 1338, citing *QVD Food Co. v. United*

*States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  Moreover, if Commerce cannot use cost data

without "undue difficulties," Commerce may find that it lacks complete and reliable cost data."

*Id*.  And in response to the ministerial error allegation, because Corinth's claims concerned

alleged misapprehensions and misunderstandings, rather than arithmetic errors and the like,

Commerce declined to make changes to the final results.  *See* Ministerial Error Memorandum.

In any event, Corinth attempts to explain how Commerce can use record information to fully

reconcile its costs much like the respondent in *Pro-Team I* and *II*.  This Court recognized,

however, that such "gap-filling alternative adjustment{s}…only leads to more questions

regarding the completeness of the reconciliation, the reconciling items, and whether all costs

were properly included or excluded." *Pro-Team I* at 1336.  Corinth must provide the cost data in the form of a workable cost reconciliation; it is not enough to flood the record with data.

In the simplest terms possible, the double counted costs of consumption, which Corinth acknowledges were added as an alternative to Commerce's reconciliation request, Corinth Br. at 18, did not reconcile the cost of manufacture to the reported cost.  Corinth states that after adding these double costs to the total costs reported in the financial accounting, it then deducted the cost of production for merchandise not under consideration from the total costs, with the remainder representing the merchandise under consideration.  *Id.*  However, Corinth never clearly identified the costs for merchandise not under consideration, merchandise sold in third countries, nor the costs removed that were attributable to the cost of consumption.  Final Calculation Memo at 3, bullet point 3.  Commerce provided a detailed and comprehensive analysis of Corinth's reconciliation data and why the submissions could not be reconciled.  Because Corinth does not challenge Commerce's methodology, but rather points to misapprehensions and misunderstandings, to which Commerce has provided reasoned explanations, Commerce's determination not to rely on Corinth's data should be sustained.

Corinth references onsite verification during the original investigation (the prior proceeding) and argues that if the same approach were used here, Corinth's reported costs reconcile with its books and records.  Corinth Br. at 22.  However, the record of each proceeding is independent and stands on its own.  *See Peer Bearing Co. v. United States*, 587 F. Supp 2d 1319, 1325 (Ct. Int'l Trade 2008) (citing *Shandong Huarong Mach. Co. v. United States*, No. 03-00676, 2005 Ct. Int'l Trade LEXIS 57 at 19 (Ct. Int'l Trade 2005).  The Court of Appeals has, in the context of prior successful verifications, "rejected the notion that Commerce is forever bound by its past practices." *Hyundai Elec. & Energy*, 15 F.4th at 1089.  The same holds here:

25

although Commerce may have been able to reconcile Corinth's costs in the investigation, based upon the record of this review, Commerce determined that such reconciliation was not possible.

V.     Commerce's Determination That Corinth's 2019 Cost Data Was Overstated And Distorted Is Supported By Substantial Evidence And Is In Accordance With Law

Corinth argues that its 2019 costs were not overstated and distortive because no merchandise under consideration was produced during the first three months of 2019. These first three months fall outside of the period of review and include production costs, yet Corinth continued to include them in its reconciliation submissions.

Commerce requested on multiple occasions that Corinth remove the costs for the first three months of 2019 because these months fall outside of the period of review yet Corinth failed to submit the reconciliation data in the form and manner requested by Commerce. By including these costs, Corinth did not submit its reconciliation data in the form and manner requested and included costs that only made Corinth's reconciliation submissions more difficult to interpret.

Corinth explains that there was no production of subject merchandise in the first three months of 2019 and thus the 2019 cost data was not overstated and distorted. Corinth Br. at 29-36. However, this does not give Corinth free license to decline to submit data in the form and manner requested, and the Court should not consider Corinth's "gap-filling alternative adjustment{s}" that are contrary to Commerce's instructions. Further, the impact this decision has on the data is more than what Corinth acknowledges. Because of these extra months, there was no period of review cost of manufacture, nor could Commerce have established one using available information because of the double counted costs, and the cost of merchandise sold in third countries and the cost of non-subject merchandise for those months were unknown. Further, had Corinth submitted a cost of manufacture from the period of review pursuant to Commerce's requests, which it could do, there would have been no discussion about whether

26

there was production of merchandise under consideration in the first three months because these costs would have been removed.  Corinth's argument is that because there was no subject merchandise production during these months, including them in the reconciliation was harmless to Commerce's analysis and it should have realized this based on the cited information is irrelevant.  Indeed, the Federal Circuit has sustained Commerce's rejection of such arguments. *See Hyundai Elec. & Energy*, 15 F.4th at 1086 (supporting Commerce rejection of Hyundai's "argument that details on these {non-MUC} items are not relevant because Commerce would ultimately exclude them.").

As explained in the final calculation memorandum, Commerce undertook an exhaustive analysis of Corinth's cost reconciliation data and found that the 2019 "reported costs still appear to include the cost of merchandise produced outside the {period of review}."  Final Calculation Memo at 2.  Accordingly, Commerce's determination applying total adverse facts available to Corinth's 2019 cost data is supported by substantial evidence and is in accordance with law.

<u>CONCLUSION</u>

For these reasons, the Court should deny plaintiffs' motion for judgment on the agency record and sustain Commerce's final results in its entirety.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                                    /s/ Eric J. Singley
                                               ERIC J. SINGLEY

Christopher Kimura                          Trial Attorney
Attorney                                    Commercial Litigation Branch
Office of the Chief Counsel                 Civil Division
    For Trade Enforcement & Compliance    U.S. Department of Justice
U.S. Department of Commerce                 P.O. Box 480
                                            Ben Franklin Station
                                            Washington, D.C. 20044
                                            eric.j.singley@usdoj.gov

January 6, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this response complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 7980 words.


<u>s/ Eric J. Singley</u>

January 6, 2023