Slip Op. 23-65

UNITED STATES COURT OF INTERNATIONAL TRADE

CORINTH PIPEWORKS PIPE INDUSTRY SA
and CPW AMERICA CO.,

                    Plaintiffs,

          v.

UNITED STATES,

                    Defendant,

          and

THE AMERICAN LINE PIPE PRODUCERS
ASSOCIATION TRADE COMMITTEE,

                    Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 22-00063

**OPINION**

[Commerce's Final Results sustained.]

Dated: April 28, 2023

Kristin H. Mowry and Bryan P. Cenko, Mowry & Grimson, PLLC of Washington, D.C., argued for Plaintiffs Corinth Pipeworks Pipe Industry S.A. and CPW America Co.  With them on the briefs were Jeffrey S. Grimson and Jill A. Cramer.

Eric J. Singley, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., argued for Defendant United States. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director.  Of counsel was Christopher Kimura, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Timothy C. Brightbill and Laura El-Sabaawi, Wiley Rein LLP of Washington, D.C., argued for Defendant-Intervenor American Line Pipe Producers Association Trade Committee.

Court No. 22-00063                                                                                   Page 2

Gordon, Judge: Plaintiffs Corinth Pipeworks Pipe Industry S.A. and CPW America Co. challenge the U.S. Department of Commerce's ("Commerce") final results of the first administrative review of the antidumping duty order covering large diameter welded pipe from Greece.  See Large Diameter Welded Pipe from Greece, 87 Fed. Reg. 7,120 (Dep't of Commerce Feb. 8, 2022) ("Final Results"), and the accompanying Issues and Decision Memorandum (Dep't of Commerce Feb. 2, 2022), PR[1] 96 ("Decision Memorandum"); see also Large Diameter Welded Pipe from Greece, 84 Fed. Reg. 18,769 (Dep't of Commerce May 2, 2019).

Before the court is Plaintiffs' motion for judgment on the agency record under USCIT Rule 56.2.  See Pls.' Am. Mot. for J. on the Agency R., ECF No. 48[2] ("Pls.' Br."); see also Def.'s Am. Resp. to Pls.' Mot. for J. on the Agency R., ECF No. 49; Def.-Intervenor Am. Line Pipe Producers Ass'n Trade Comm.'s Resp. Opp. Pls.' Mot. for J. on the Agency R., ECF No. 35; Pls.' Am. Reply in Supp. of Mot. for J. on the Agency R., ECF No. 50 ("Pls.' Reply").  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[3] and 28 U.S.C. § 1581(c) (2018).  For the reasons set forth below, the court sustains Commerce's Final Results.

---

[1] "PR" refers to a document contained in the public administrative record.  See ECF No. 19-1.

[2] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

## I. Background

Plaintiff Corinth Pipeworks Pipe Industry S.A. ("Corinth") was the sole mandatory respondent, and indeed the sole producer and/or exporter of the subject merchandise, in the underlying administrative review.[4]   Final Results, 87 Fed. Reg. at 7,121; see also Large Diameter Welded Pipe from Greece, 86 Fed. Reg. 43,172 (Dep't of Commerce Aug. 6, 2021) ("Preliminary Results"), and the accompanying Preliminary Decision Memorandum (Dep't of Commerce July 30, 2021), PR 73 ("PDM"). The period of review was April 19, 2019 through April 30, 2020.  PDM at 1.

Commerce issued its initial antidumping questionnaire to Corinth in July 2020, followed by two supplemental questionnaires in May and July 2021 respectively regarding Corinth's cost of production ("COP") and constructed value ("CV") data (Section D).  Id. at 2.  Corinth timely responded to both, but because its response to the second supplemental questionnaire came shortly before the issuance of the Preliminary Results, Commerce stated in the PDM that it would consider that response in the Final Results. Id. at 2.

In the initial questionnaire, Commerce directed Corinth to report per-unit COP and CV figures based on the company's "actual costs incurred . . . during the period of review ["POR"], as recorded under [its] normal accounting system."  Dep't of Commerce Questionnaire (July 17, 2020) at D-2, PR 11.  Commerce emphasized that "[t]he

---

[4] Plaintiff CPW America Co. is Corinth's U.S. subsidiary and the U.S. importer of large diameter welded pipe who participated in the underlying proceeding.  See Summons, ECF No. 1.

CONNUM[5] specific COP and CV figures [provided] . . . <u>must reconcile to the actual costs</u> <u>reported in your company's normal cost accounting system and to the accounting records</u> <u>used by your company to prepare its financial statements</u>." <u>Id.</u> at D-10.  To accomplish this goal, Commerce provided a sample reconciliation for Corinth to follow, directing Corinth to take "a 'top-down' approach (<u>e.g.</u>, financial statements to per-unit cost), starting with cost of sales from the financial statements and proceeding step-by-step down through cost of manufacturing [("COM")] for the reporting period to the summation of the reported per-unit costs." <u>Id.</u> at D-12.

Corinth responded timely to the initial questionnaire, but Commerce found that the company's response regarding Section D contained deficiencies.  <u>See</u> Corinth's Initial Sec. D Questionnaire Resp. (Sept. 21, 2020), PR 34–35; <u>Decision Memorandum</u> at 12 (noting that Corinth's reconciliation was not submitted as "one complete reconciliation" as requested, but rather, "two separate reconciliations for different parts of the POR," and determining that the reconciliation provided "did not reconcile the expenses per the audited income statement to its extended cost database," "relied on amounts that included the counting of product costs at both the semifinished stage and the finished product stage, resulting in 'double counted' costs from intermediate stages," and "did not show the total extended POR COM from the COP database").

---

5 A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding).  All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison.

Accordingly, Commerce issued its first supplemental questionnaire, directing Corinth, "[a]s requested, [to] provide worksheets in the format shown below, reconciling the total POR COM to the total of the per-unit manufacturing costs submitted to Commerce" and to "[i]dentify and quantify" various reconciling items.  Dep't of Commerce Suppl. Sec. D Questionnaire (May 27, 2021) at 5, PR 55 (emphasis added); see also Decision Memorandum at 12–13.  Corinth's first supplemental response again included two partial reconciliations instead of a single complete reconciliation, which still "failed to exclude the first quarter 2019 costs" and was also missing other reconciling items.  See Corinth's First Suppl. Sec. D Questionnaire Resp. (June 22 & 25, 2021), PR 62–63; Decision Memorandum at 13.

Commerce then issued a second supplemental Section D questionnaire, warning Corinth that its "section D and the supplemental D responses lacked adequate descriptions of [its] response methodology."  Dep't of Commerce Second Suppl. Sec. D Questionnaire ("Second Suppl. Quest.") (July 15, 2021) at 4, PR 65.  Commerce further explained that "[the company's] extensive calculation worksheets and reconciliation are difficult to interpret because of the lack of adequate descriptions as to the methodology used in the normal records or in [its] reporting to Commerce."  Id.  Commerce asked Corinth to explain, inter alia, why Corinth found it necessary to include reported costs for months outside the POR and why the company was "unable to generate a single COM report from its system."  Id. at 3–4.  Commerce also requested explanations for certain steps, lines of data, and definitions contained in Corinth's submitted worksheets.  Id. at 4.

In its second supplemental response, Corinth again insisted that it could not combine multiple years in its SAP (cost accounting system) reporting, and thus needed to submit separate reconciliations.  Corinth's Second Suppl. Sec. D Questionnaire Resp. ("Corinth's Second Suppl. Quest. Resp.") (July 22, 2021) at 13, PR 69; see also Decision Memorandum at 13.  Further, Corinth confirmed that it could not "generate a single COM report from its system because doing so would double or triple count costs when the product passed through multiple phases."  Corinth's Second Suppl. Quest. Resp. at 2; Decision Memorandum at 14.  Corinth stated, however, that "[t]o demonstrate that Commerce has complete cost data for this review which reconciles to [Corinth's] audited financial statements, [Corinth] prepared and submitted an annotated version of its cost reconciliation exhibit for 2019," ostensibly showing "a 'road map' for the worksheets and source data contained in the exhibit."  Corinth's Second Suppl. Quest. Resp. at 14 ("On each sheet of the annotated version of [the exhibit, Corinth] inserted a brief explanation of what information the sheet presents, the source of the data, and how the sheet relates to the overall reconciliation.").

In the Preliminary Results, Commerce conducted the less than fair value ("LTFV") analysis by comparing the constructed export price of Corinth's U.S. sales to normal value based on CV.  PDM at 7, 14 ("[19 U.S.C. § 1677b(e)] provides that CV shall be based [in part] on the sum of the cost of materials and fabrication for the imported merchandise . . . .").  Based on that analysis, Commerce "preliminarily determine[d] that sales of the subject merchandise [had] not been made at prices less than normal value,"

and that Corinth's estimated weighted-average dumping margin was 0.00 percent. Id. at 1; Preliminary Results, 86 Fed. Reg. at 43,172.

After issuing the Preliminary Results and reviewing Corinth's questionnaire responses in their entirety, Commerce attempted "to piece together a meaningful reconciliation" itself "[u]sing the voluminous worksheets, datafiles, and report downloads submitted by Corinth." Decision Memorandum at 14; see Cost of Production and Constructed Value Calculation Adjustments for Final Results (Feb. 2, 2022), PR 97 ("Final Results Calculation Memorandum").  From its analysis, Commerce identified four flaws in Corinth's cost responses: (1) that Corinth "failed to provide a proper cutoff of accounting periods and one complete POR cost reconciliation worksheet"; (2) that, even after the removal of amounts designated for exclusion, the total TOTCOM (total cost of manufacturing) costs "still include[d] 'double counted' costs in the COP/CV file reported by [Corinth] per their SAP [cost accounting] system"; (3) that, once the double counted costs were removed, "the amounts contained in the COP/CV file include costs and quantities that are not in accordance with [Corinth's] GAAP compliant audited financial statements"; and (4) that "significant differences in materials and conversion costs" existed between the audited financial statements and the SAP system report. Final Results Calculation Memorandum at 2–4.

Consequently, Commerce concluded that Corinth's cost data was unusable because the company "failed to provide a proper reconciliation of the extended cost file amounts to [cost of goods sold] per their audited income statement." Decision Memorandum at 10.  Commerce further determined that Corinth had "not

cooperate[d] to the best of its ability in responding to Commerce's requests for information concerning its cost of producing the merchandise under consideration [("MUC")]."  Id. Accordingly, Commerce applied "total" adverse facts available ("AFA") and selected, as Corinth's dumping margin, "the highest dumping margin alleged in the petition," 41.04 percent.  Id. at 7.

Now before the court, Plaintiffs challenge the Final Results.  Specifically, Plaintiffs argue that Commerce unreasonably applied total AFA when determining Corinth's dumping margin because it did not permit an opportunity for comment by the parties on the use of AFA,[6] erroneously rejected Corinth's cost data, and ultimately selected a unreasonable rate.  For the reasons that follow, the court sustains the Final Results.

## II. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S.

---

[6] Following the Final Results, Corinth filed comments purporting to identify ministerial errors in Commerce's Final Results Calculation Memorandum.  See Corinth's Ministerial Error Comments (Feb. 9, 2022), PR 101.  Commerce determined that Corinth's challenge raised substantive issues that were methodological rather than ministerial and declined to consider Corinth's arguments.  See Dep't of Commerce Ministerial Error Memorandum (Mar. 3, 2022), PR 110.  Before the court, Plaintiffs do not challenge Commerce's decision to reject the comments as methodological.

474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2023).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022).

### III. Discussion

### A. 19 U.S.C. § 1677m(g)

During the course of an administrative review, but before making a final determination, Commerce "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment."  19 U.S.C. § 1677m(g).

According to Plaintiffs, Commerce failed to satisfy the requirements of § 1677m(g) because it did not give Corinth an opportunity to comment on its changed dumping margin methodology—i.e., its application of total AFA—in the <u>Final Results</u>.  <u>See</u> Pls.' Br. 9 ("This provision requires Commerce to give parties an opportunity to comment on a post-preliminary change in methodology (<u>e.g.</u>, a different method of calculating the respondent's dumping margin) prior to its final determination/results.").

Importantly, Plaintiffs do not claim that Corinth lacked an opportunity to comment on <u>new information obtained</u> by Commerce; rather, they object to Commerce's failure to allow comment on its <u>interpretation</u> of information already on the record.  <u>See, e.g.</u>, <u>id.</u> at 2 ("Because Commerce's <u>calculations and worksheets</u> were not disclosed to [Corinth] prior to the <u>Final Results</u>, [the company] had no opportunity to correct Commerce's fundamental misunderstandings or otherwise comment on the analysis and conclusions underlying Commerce's AFA findings.").

Based on their reading of § 1677m(g), Plaintiffs contend that Commerce's decision to apply total AFA in the <u>Final Results</u> was unreasonable, and that the matter should therefore be remanded so that Commerce can consider Corinth's arguments in the first instance.  Pls. Br. 2–4, 8–13 ("[B]y failing to provide [Corinth] with the chance to comment on the change in methodology in the Final Results, Commerce deprived [Corinth] of the ability to demonstrate that the cost data were complete.").  To support their position, Plaintiffs cite decisions where the court either discussed Commerce's obligations under § 1677m(g), or ordered remand to allow the parties to comment on new information obtained by Commerce, changes in Commerce's methodology, or other issues that were

not raised at the administrative level.  See Pls. Br. 9–10 (collecting cases).  In particular, Plaintiffs rely on Koyo Seiko Co. v. United States, wherein the court noted that Commerce acted in accordance with § 1677m(g) when it provided the parties with an opportunity for comment on its introduction of a new methodology—albeit in the 15th administrative review—to determine which home market sales should be compared to sales made in the United States.  31 CIT 1512, 1513, 1520, 516 F. Supp. 2d 1323, 1328, 1333–34 (2007).

As a threshold matter, Plaintiffs misunderstand the requirements of § 1677m(g). While Plaintiffs assert that § 1677m(g) "requires Commerce to give parties an opportunity to comment on a post-preliminary change in methodology (e.g., a different method of calculating the respondent's dumping margin) prior to its final determination/results," the provision's mandate is confined to information obtained by Commerce on which the parties have not yet had an opportunity to comment.  The court has previously explained this distinction, observing that "[w]hen Commerce calculates margins 'it generates information; it does not collect information.'"  Tri Union Frozen Prods., Inc. v. United States, 40 CIT ___, ___, 163 F. Supp. 3d 1255, 1289 (2016) (citation omitted) ("[T]he statute requires Commerce to provide an opportunity to comment only on information it collects or obtains externally, not findings that it makes or generates internally. . . . Commerce's interpretation of factual information does not lead to the conclusion that its final determination is subject to comment.").  Here, Commerce's review of the information already on the record led it to conclude that Corinth's margin should be calculated based on total AFA.  See Decision Memorandum at 15 ("Although we relied on Corinth's cost data in the Preliminary Results, after further evaluating the information

on the record of this proceeding and in light of parties' submissions, . . . . [w]e conclude

that the necessary information for Corinth is not available on the record and that Corinth

failed to provide such information in the form or manner requested and, thus, significantly

impeded the proceeding.").

      Likewise, Plaintiffs' reliance on what they view as the applicable caselaw

is misplaced.      The decisions cited by Plaintiffs either involve distinguishable

circumstances warranting compliance with § 1677m(g), or do not invoke § 1677m(g)

at all.  See Home Prods. Int'l, Inc. v. United States, 32 CIT 337, 339, 556 F. Supp. 2d

1338, 1340 (2008) (granting Commerce's voluntary remand request where interested

parties had not had opportunity to comment on new information on record); Bristol Metals,

L.P. v. United States, Court No. 09-00127, Order Dated Oct. 23, 2009, ECF No. 39

(granting Commerce's voluntary remand request without discussing § 1677m(g)); Nan Ya

Plastics Corp. v. United States, 37 CIT 188, 194, 905 F. Supp. 2d 1348, 1354 (2013)

(remanding because court could not sustain Commerce's determination based only on

counsel's post hoc rationalizations);  CC Metals & Alloys, LLC v. United States, 40 CIT

___, ___, 145 F. Supp. 3d 1299, 1308 (2016) (same); see also Pls.' Br. 9–10 (citing all

the foregoing).

      The case on which Plaintiffs primarily rely, Koyo Seiko, is likewise unavailing.

See 31 CIT at 1520, 516 F. Supp. 2d at 1333–34; Pls.' Br. 9.  Koyo Seiko relied, as do

Plaintiffs, on Shikoku Chemicals Corp. v. United States for the proposition that

"[p]rinciples of fairness prevent Commerce from changing its methodology at this late

stage [i.e., the final results]."  16 CIT 382, 388, 795 F. Supp. 417, 421 (1992); see Koyo

Seiko, 31 CIT at 1520, 516 F. Supp. 2d at 1333; Pls.' Br. 9.

        The Court of Appeals for the Federal Circuit has recognized, however, that Shikoku

turned on a showing of detrimental reliance.  SKF USA, Inc. v. United States, 537 F.3d

1373, 1381 (Fed. Cir. 2008).   Beyond citing to Koyo Seiko and Shikoku, Plaintiffs'

argument based on detrimental reliance is lacking.  See generally Pls.' Br. (not discussing

detrimental reliance); Pls.' Reply 9 ("[Corinth] relied on the methodology verified and

followed by Commerce in the initial investigation when reconciling its reported costs. . . .

[Corinth] cannot be faulted for not clarifying a record that it believed was clear based on

the methods that Commerce had previously accepted.").  Plaintiffs' argument ignores that

"each administrative review is a separate exercise of Commerce's authority that allows

for different conclusions based on different facts in the record."   Jiaxing Brother

Fastener Co. v. United States, 822 F.3d 1289, 1299 (Fed. Cir. 2016) (citation omitted).

As the court has discussed, Commerce was entitled to generate calculations and conduct

its analysis based on the information on the record before it.  This remains true even if

Commerce reached different conclusions than it did in the original investigation, or,

as here, in the Preliminary Results.  Further, Plaintiffs' assertion that Corinth reasonably

believed that the record in this review was clear is undermined by the fact that Commerce

indicated, by means of its supplemental questionnaires, that Corinth's cost responses

needed clarification.   See, e.g., Second Suppl. Quest. at 4 ("[Corinth's] extensive

calculation worksheets and reconciliation are difficult to interpret because of the lack

of adequate descriptions as to the methodology used in the normal records or in [its]

reporting to Commerce."). Thus, Plaintiffs "cannot properly analogize [their] situation to that in <u>Shikoku</u>, where '[t]he record contain[ed] evidence that plaintiffs adjusted their prices in accordance with methodology consistently applied by Commerce in an attempt to comply with United States antidumping law.'" <u>SKF USA</u>, 537 F.3d at 1381 (quoting <u>Shikoku</u>, 16 CIT at 386, 795 F. Supp. at 420).

In sum, Plaintiffs attempt to broaden the reach of § 1677m(g) to obligations that the statute was not intended to create.[7] Relatedly, Plaintiffs have failed to point to <u>any</u> statutory requirement outside of § 1677m(g) requiring Commerce to issue a "post-preliminary" decision other than the final results. Pls.' Br. 11–13 ("Commerce could have resolved any concerns surrounding the reconciliation of [Corinth's] reported data by issuing a post-preliminary decision, which Commerce often does when important issues remain undecided in its preliminary decision."). The court will not impose requirements on Commerce's administrative process that are not found in the statute, especially where it is well established that "Commerce may change its stance on issues decided preliminarily in its final determinations, so long as it explains the reasoning for the change and 'its decision is supported by substantial evidence and in accordance with law.'" <u>Gov't of Argentina v. United States</u>, 45 CIT ___, ___, 542 F. Supp. 3d 1380, 1391

---

[7] Indeed, Plaintiffs' argument urging the court to remand this matter "so that the Court does not have to do the agency's work in attempting to discern how Commerce may respond to the deficiencies raised by [Corinth] that must be raised for the first time here" might have been better made under § 1677m(d). Section 1677m(d) requires Commerce to "promptly inform" a person who has made a deficient submission "of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity remedy or explain the deficiency." Commerce proactively explained how its determination complied with that subsection. <u>Decision Memorandum</u> at 4.

(2021) (quoting <u>Hyundai Steel Co. v. United States</u>, 42 CIT ___, ___, 319 F. Supp. 3d

1327, 1343 (2018)); <u>see also, e.g.</u>, <u>JBF RAK LLC v. United States</u>, 38 CIT ___, ___,

991 F. Supp. 2d 1343, 1352 (2014) (holding, in context of post-preliminary

determinations, that "Commerce enjoys considerable discretion in the conduct of its

administrative proceedings").

Accordingly, the court rejects Plaintiffs' argument that Commerce unreasonably

changed its methodology in the <u>Final Results</u> and turns to the issue of whether

Commerce's decision to rely on total AFA in the <u>Final Results</u> was reasonable.

## B. Application of Total AFA

Commerce may rely on "facts otherwise available" if, among other things,

an interested party "withholds information" that Commerce has requested, fails "to provide

such information . . . in the form and manner requested," or "significantly impedes

a proceeding." 19 U.S.C. § 1677e(a). Additionally, if Commerce "finds that an interested

party has failed to cooperate by not acting to the best of its ability to comply with a request

for information," Commerce "may use an inference that is adverse to the interests of that

party in selecting from among the facts otherwise available." <u>Id.</u> § 1677e(b)(1).

Here, Commerce determined that the use of facts otherwise available was

warranted because Corinth failed to submit "a complete and usable cost reconciliation"

in the form and manner requested, thus withholding "information necessary

to demonstrate that all costs were either appropriately included or excluded from the

reported cost database." <u>Decision Memorandum</u> at 4. For Commerce, "[b]y failing

to correct deficiencies in its cost reconciliation, Corinth . . . significantly impeded

the proceeding because reconciling items were unidentified and unsupported by the record." Id.

As for drawing an adverse inference in selecting from among the facts otherwise available, Commerce concluded that Corinth failed to cooperate because, "even after multiple requests, Corinth did not submit a complete cost reconciliation." Id. at 6. Corinth's failure to follow Commerce's requested reconciliation format, combined with the fact that the company "did not, for example, alert Commerce that it would have any difficulty" reconciling "its audited financial statement cost of manufacturing . . . to the reported cost database," led Commerce to find that "Corinth did not act to the best of its ability to comply with a request for information." Id.

Finally, Commerce used total rather than partial AFA because the absence of a complete and useable cost reconciliation rendered "the information that Corinth provided . . . too incomplete to serve as a reliable basis for reaching a determination," and cited the court's recognition that "cost information is a vital part of [Commerce's] dumping analysis." Id. at 5 (citing Mukand, Ltd. v. United States, 37 CIT 443, 454 (2013) (not reported in Fed. Supp.)) ("Additionally, Commerce has previously found that failure to provide a cost reconciliation warrants use of total AFA."). Commerce explained that, "[w]ithout the ability to reasonably establish that all costs were properly included or excluded, the entire cost response is called into question and leaves Commerce without the ability to use the per-unit costs in the cost database, as no adjustment to remedy the deficiency can be reasonably identified." Decision Memorandum at 5.

**1. Facts Available**

As an initial matter, Plaintiffs concede that Corinth's Section D responses—specifically, its cost reconciliation—were not submitted in the form and manner Commerce requested.    Plaintiffs admit that Corinth submitted data for months outside the POR, and added a step to Commerce's reconciliation structure by adjusting for double-counted costs contained in its cost accounting system's data. Pls.' Br. 18 ("[Corinth] did not isolate those costs associated with the months prior to the POR as a separate step because [it] did not produce MUC in those three months. . . . The only other step in which [Corinth] provided an alternate to Commerce's preferred reconciliation structure was the last step where [Corinth] added the cost of consumption to the total costs reported in the financial accounting and then deducted the cost of production for merchandise not under consideration." (emphasis added)). While acknowledging these deviations from Commerce's instructions, Plaintiffs argue that Commerce should have accepted Corinth's data because it was "usable."  Id.

Despite its belief that these changes were necessary to properly reconcile its costs, Corinth did not "notify Commerce that it was unable to submit [its cost] information in the form and manner requested in Commerce's supplemental questionnaires."   Decision Memorandum at 4.   Rather, according to Commerce, Corinth preferred "to provide a voluminous dump of different reports, worksheets, and tables."   Id.  Plaintiffs now contend that Corinth's cost reconciliation—deviations included—was "submitted . . . in the 'form and manner' requested by Commerce."   Pls.' Br. 17.  For Commerce, however, while Corinth's "data files (with tens of thousands of lines of data) and worksheets

(showing significant amounts of costs repeatedly being swapped in and out of calculations) . . . [were] voluminous and complex," they were not "responsive to Commerce's specific requests," nor did "the files provide a clear reconciliation of the reported data."   Decision Memorandum at 11 ("Merely providing a bulk of information does not constitute a response to inquiries requesting that a party clearly explain how its submitted cost data reconcile to their audited financial statement COM.").

When discussing Corinth's failure to respond in the "form and manner requested," Commerce explained its rationale for requesting a reliable reconciliation of respondents' cost data:

> Commerce must . . . ensure that the aggregate amount of the reported costs (i.e., summation of the unit costs extended by the corresponding production quantities) captures all costs incurred by the respondent in producing the MUC during the period under consideration.  A major point of the reconciliation is to establish that the reported unit costs and production quantities square with the financial accounting system, the cost accounting system, and the production records, as required by the statute.

Id.

Commerce noted that it could not reconstruct Corinth's submitted reconciliation, finding: (1) double-counted costs, (2) mismatches between cost categories that it believed should reconcile, and (3) inclusion of months of data outside the POR.  Specifically,

> Commerce undertook a long and exhaustive analysis of [Corinth's] cost reconciliation exhibits.  We analyzed the cost reconciliations given by [Corinth] to determine whether Commerce could reasonably rely on [Corinth's] cost information on the record. . . . Our analysis started with [Corinth's] 2019 audited financial statement COM amount and then grossed the amount up by adding the "double counting" reconciliation line items to reconcile to the total costs per SAP

>System (i.e., 2019 SAP cost report).  Then we removed each
>identifiable overstated cost in order to get to a total reportable
>costs figure.  Our analysis not only demonstrates that the total
>COM provided by [Corinth] does not reconcile to the cost of
>reportable merchandise under consideration (MUC) but
>brings to light certain other issues that might have been
>addressed if [Corinth] had been responsive to our multiple
>requests for a proper reconciliation.

Final Results Calculation Memorandum at 2.

Plaintiffs devote a significant portion of their briefing and their argument to challenging the findings Commerce reached in its Final Results Calculation Memorandum and identifying the errors Commerce made in reconstructing Corinth's cost reconciliation.  See Pls.' Br. 18–36; Oral Argument at 01:00–25:20, ECF No. 51 (Apr. 19, 2023).  According to Plaintiffs, Commerce mistakenly identified costs as "double-counted" when all double-counted costs were already removed; Commerce believed at key points of its analysis that it was comparing data from Corinth's cost and financial accounting systems, when it was in fact relying only on data from the cost accounting system; Commerce also failed to recognize when it was comparing data derived from different product pools; and Commerce assumed Corinth's submission of cost accounting system reports from months outside of the POR meant that Corinth had submitted data regarding the MUC for months outside of the POR.  Pls.' Br. 18–36.

In Plaintiffs' view, had Commerce complied with Corinth's instructions as to how to read its submissions, a full reconciliation of the company's costs would have been possible.  Id. at 17 ("[Corinth] presented a detailed step-by-step summary of its cost reconciliation with screenshots and narrative explanations in its second supplemental section D questionnaire response."); see also id. at 22 ("In Exhibit 1, [Corinth]

demonstrates step-by-step using Commerce's own reconciliation from the Calculation Memorandum that [the company's] reported costs do reconcile with its SAP cost system and that the final step undertaken by Commerce in its attempted cost reconciliation was incorrect and resulted in Commerce's erroneous determination that [Corinth's] costs did not reconcile.").  Plaintiffs also contend that Corinth could have corrected any deficiencies if Commerce had provided adequate notice thereof: "To the extent that [Corinth's] explanation [of its cost data] needed further clarification, [Corinth] could and would have resolved outstanding issues if it had notice that this explanation was not sufficient and not understood."  Id. at 24.

Plaintiffs' focus on Commerce's alleged inability to understand and replicate Corinth's calculations is misplaced.  "[T]he burden of creating an adequate record lies with interested parties and not with Commerce."  Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337–38 (Fed. Cir. 2016) (quoting QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  Further, "[t]he mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003). Thus, Plaintiffs bear the burden of showing that Commerce acted unreasonably in rejecting Corinth's cost data.

Plaintiffs have failed to make such a demonstration.  Their attempts to clarify the record by detailing Commerce's alleged errors only serve to support the finding that Corinth's submissions were inadequate.  For example, Plaintiffs point to Commerce's

allegedly erroneous "additional deduction from the fully reconciled costs" intended to account for double-counting, while later acknowledging—as the court has noted—that Corinth deviated from Commerce's "preferred reconciliation structure" to "eliminate double-counted costs recorded in SAP" itself.  Pls.' Br. 5, 18.  Likewise, Plaintiffs claim that Corinth's failure "to exclude costs from the first quarter of 2019 that fell outside the POR" did not justify the application of total AFA, placing the onus on Commerce to interpret the over-inclusive data and conclude that "no production of MUC took place" during those months.  See id. at 5, 29–31.  These arguments, and Plaintiffs' additional descriptions of Corinth's preferred reconciliation methods, at best, provide an alternative means of analyzing the submitted data—an alternative which, by Plaintiffs' own admission, was not wholly consistent with Commerce's instructions.  See id. at 18.  That Plaintiffs may have identified "another possible reasonable choice" for the form and manner of its submissions falls short of the mark, especially where, as here, Plaintiffs' preferred means of reconciliation is confusing and requires Commerce to sift through unrequested and irrelevant information.  See, e.g., Uttam Galva Steels Ltd. v. United States, 44 CIT ___, ___, 476 F. Supp. 3d 1387, 1393 (2020) (quoting Tianjin Wanhua Co. v. United States, 40 CIT ___, ___, 179 F. Supp. 3d 1062, 1071 (2016)).  "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review."  Pokarna Engineered Stone Ltd. v. United States, 56 F.4th 1345, 1349 (Fed. Cir. 2023) (quoting In re Jolley, 308 F.3d 1317, 1329 (Fed. Cir. 2002)).

Therefore, based on its description of its own attempts to reconcile Corinth's information, and its explanation as to why a cost reconciliation was a necessary component underpinning its LTFV analysis as a whole, Commerce's decision to rely on facts available when determining Corinth's dumping margin was reasonable. See, e.g., Macao Com. & Indus. Spring Mattress Mfr. v. United States, 44 CIT ___, ___, 437 F. Supp. 3d 1324, 1332 (2020) (accepting cost reconciliation requirement where Commerce "fully described why the cost reconciliations it sought were vital for its . . . determinations and why [Commerce] could not accept Plaintiff's claimed inability to comply with Commerce's request for cost reconciliations").

### 2. Adverse Inferences

To justify the use of adverse inferences, Commerce must show that "a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations," and that the particular respondent has failed "to put forth its maximum efforts to investigate and obtain the requested information from its records."  Nippon Steel, 337 F.3d at 1382–83 (citation omitted).   Intent is irrelevant when determining whether a respondent has cooperated to the best of its ability.  Id. at 1383 ("The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent."); see also, e.g., Ferrostaal Metals Gmbh v. United States, 45 CIT ___, ___, 518 F. Supp. 3d 1357, 1375–76 (2021) (rejecting plaintiffs' argument that "timely, but noncompliant" responses demonstrate cooperation).

In the <u>Final Results</u>, Commerce concluded that, despite "multiple chances"—<u>i.e.</u>,

supplemental questionnaires—"Corinth refused to provide the reconciliation in the format

requested." <u>Decision Memorandum</u> at 7 ("In addition, based on our analysis of the record

information, there is a large unreconciled difference between Corinth's audited financial

statement COM and its reported costs.").   As one example of Corinth's lack of

cooperation, Commerce found that

> While Corinth may not have been able to generate a cost
> report for a period that spans two fiscal years, Corinth admits
> that it can extract an SAP costing report for a range of months
> in the same year.  Thus, Corinth <u>could have generated data
> for the last nine months of 2019 as it did for the first four
> months of 2020</u>. . . . This exercise would have removed the
> costs incurred during the first three months of the POR.

<u>Id.</u> at 13–14 (emphasis added).

Corinth has failed to explain why it could not cooperate by generating cost reports

for the ranges of months that Commerce requested.  It is telling that, as proof of Corinth's

cooperation, Plaintiffs point to the company's reliance on the approach it followed at the

investigation stage, not on Commerce's instructions in the current review.  <u>See</u> Pls.' Br. 38

("[Corinth] followed the same general approach from the original investigation

in responding to Commerce's cost questionnaires in the first administrative review.

[Corinth's] cost responses were fully verified during an on-site verification in the original

investigation and [it] believed it was acting to the best of its ability by following the same

approach from the original investigation." (emphasis added)); <u>id.</u> at 6 n.3 ("The original

investigation cost verification report is on the record of this administrative review

in [Corinth's] Rebuttal Factual Information Submission.").  Plaintiffs' arguments again fail

to recognize that Commerce is entitled to reach different findings during separate segments of its administrative proceedings.  See, e.g., Jiaxing, 822 F.3d at 1299. Here, Commerce was not required to find that Corinth cooperated in the administrative review based on Commerce's findings about the company's information at the investigation stage.

Plaintiffs have failed to persuade the court that Commerce's decision to apply total AFA was unreasonable.  In the Decision Memorandum, Commerce both explained the crucial nature of the information it deemed missing and incomplete—the cost reconciliation—and described Corinth's multiple instances of uncooperative behavior. Decision Memorandum at 6 ("Because Corinth failed to submit a complete cost reconciliation, we find that Corinth did not provide Commerce with full and complete answers to Commerce's inquiries in this proceeding.   Furthermore, because Corinth did not provide the reconciliation in the format requested and, thus, did not reconcile its audited financial statement cost of manufacturing . . . to the reported cost database, and Corinth did not, for example, alert Commerce that it would have any difficulty doing so, we find that Corinth did not act to the best of its ability to comply with a request for information.").  It was "reasonable for Commerce to expect . . . more forthcoming responses," and to use total AFA when it did not receive such responses.  Nippon Steel, 337 F.3d at 1383.  The court therefore sustains Commerce's use of total AFA based on Corinth's failure to submit, in the form and manner requested, the information necessary to reconcile its costs.

### C. Dumping Margin

Plaintiffs lastly contend that, even if the court sustains Commerce's determination to apply AFA, the AFA rate selected by Commerce was unreasonable.  Plaintiffs maintain that the 41.04 percent rate—the highest alleged in the Petition—was "excessive, punitive, and unjustified."  Pls.' Br. 40 ("In selecting an AFA rate, Commerce must not 'impose punitive, aberrational, or uncorroborated margins' and an AFA rate should 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'"  (quoting BMW of N. Am. LLC, 926 F.3d 1291, 1297, 1300 (Fed. Cir. 2019))).

Under 19 U.S.C. § 1677e(b)(2), Commerce is empowered to rely on various sources of information for adverse inferences, including the petition.  When Commerce relies on information derived from the petition, it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal."  Id. § 1677e(c)(1).  "Corroborate means that the Secretary will examine whether the secondary Information to be used has probative value."  19 C.F.R. § 351.308(d) (2022).  The corroboration requirement captures Congress's intent for an AFA "rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance."  F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000); see also Hubscher Ribbon Corp. v. United States, 38 CIT ___, ___, 979 F. Supp. 2d 1360, 1366 (2014) ("[Corroboration is] a substantial evidence question in which the court reviews the reasonableness of Commerce's actions against a known legal standard given

the facts and circumstances of the administrative record.").  "An AFA rate is punitive if it is not 'based on facts' and 'has been discredited by the agency's own investigation.'" Qingdao Taifa Grp. v. United States, 35 CIT 820, 826, 780 F. Supp. 2d 1342, 1349 (2011) (quoting De Cecco, 216 F.3d at 1033).

Plaintiffs' arguments here fail to demonstrate that the selected AFA rate was unreasonable.  Relying only on broad assertions that the selected rate was "drastically overstated, punitive and unjustified," as well as on their prior arguments opposing Commerce's application of total AFA, Plaintiffs fail to persuasively explain how Commerce's selection of the 41.04 percent rate was unsupported by the record. See Pls.' Br.  41 (arguing that Corinth was cooperative respondent, and citing timeliness of Corinth's responses, its adherence to "same approach from the original investigation," and Commerce's purported failure to issue additional questionnaires between the Preliminary Results and the Final Results, as proof that "Commerce erred" by selecting petition rate).  Without more, Plaintiffs have failed to develop an argument as to what, if any, "mitigating circumstances" might call into question Commerce's choice of rate.  See Pls.' Br. 41; cf. BMW, 926 F.3d at 1302 (noting "unique factual circumstances surrounding BMW's failure to return the quantity-and-value questionnaire" that warranted further explanation by Commerce to justify a change in rate from 1.43 percent to 126.44 percent (emphasis added)).

Plaintiffs suggest that Commerce should have adopted an alternative rate, namely Corinth's dumping margin of 10.26 percent from the original investigation, which "required no secondary confirmation but instead was a calculated rate."  Pls.' Br. 42.  For Plaintiffs,

this rate is "sufficiently adverse given that [Corinth's] dumping margin in this administrative review would have been 0.00 percent had Commerce used [Corinth's] actual reported data." Id. Corinth is not entitled, however, to a rate that it would have received if it had fully cooperated in the review. 19 U.S.C. § 1677b(d)(3)(A). Nor is Plaintiff entitled to a calculated rate that does not require secondary confirmation. See, e.g., Hubscher Ribbon, 38 CIT at ___, 979 F. Supp. 2d at 1369 (acknowledging that use of petition rates is authorized by statute).

Further, contrary to Plaintiffs' assertion that Commerce failed to link the petition rate to Corinth itself, Commerce specifically found that the 41.04 percent rate was "within the range of transaction-specific margins calculated for Corinth in the investigation, and, thus, the 41.04 percent rate is both reliable and relevant." Decision Memorandum at 8. While Commerce's explanation relies on a single link between the rate and the respondent, this can come as no surprise where there is only one respondent—and where that respondent has been uncooperative. "Under such circumstances, Commerce's corroboration may be less than ideal because the uncooperative acts of the respondent [have] deprived Commerce of the very information that it needs to link an AFA rate to [respondent's] commercial reality." Hubscher Ribbon, 38 CIT at ___, 979 F. Supp. 2d at 1369 (quoting Qingdao Taifa, 35 CIT at 826, 780 F. Supp. 2d at 1349). Accordingly, the court sustains as reasonable Commerce's selection of the petition rate as the AFA rate.

### IV. Conclusion

For the foregoing reasons, the court concludes that Commerce reasonably applied total AFA in determining Corinth's antidumping duty margin in the <u>Final Results</u>. Therefore, the court sustains the <u>Final Results</u>.  Judgment will enter accordingly.


                                                                    /s/ Leo M. Gordon
                                                                  Judge Leo M. Gordon


Dated: April 28, 2023
       New York, New York